IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BARBARA ELIFRITZ, Personal Representative
for the Estate of John Elifritz, and Guardian
for minor child S.E.,

                Plaintiff,

    v.

OFFICER KAMERON FENDER, OFFICER
ALEXANDRU MARTINIUC, OFFICER
BRADLEY NUTTING, OFFICER CHAD
PHIFER, OFFICER ANDREW POLAS,
OFFICER RICHARD BAILEY, OFFICER
JUSTIN DAMERVILLE, and CITY OF
PORTLAND,

                Defendants.

No. 3:18-cv-00903-HZ

OPINION & ORDER

Andrew M. Stroth
Carlton Odim
ACTION INJURY LAW GROUP, LLC
191 North Wacker Drive, Suite 2300
Chicago, IL 60606

Timothy R. Volpert
TIM VOLPERT P.C.
610 SW Alder Street, Suite 415
Portland, OR 97205

      Attorneys for Plaintiff

Ashley M. Carter
Naomi Sheffield
J. Scott Moede
CITY OF PORTLAND
1221 SW Fourth Avenue, Room 430
Portland, OR 97204

      Attorneys for Defendants

HERNÁNDEZ, District Judge:

Plaintiff Barbara Elifritz, personal representative for the estate of John Elifritz and guardian for minor child S.E., brings this action against Defendants City of Portland ("the City") and Officer Kameron Fender, Officer Alexandru Martiniuc, Officer Bradley Nutting, Officer Chad Phifer, Officer Andrew Polas, Officer Richard Bailey, and Officer Justin Damerville ("the officer defendants"). Plaintiff brings a Fourth Amendment claim under 42 U.S.C. § 1983 and a state law claim for wrongful death. Defendants move for summary judgment on each of Plaintiff's claims. The Court grants Defendants' motion for summary judgment.

The circumstances of this case required several police officers to make a split-second decision that ended Mr. Elifritz's life. At the time, Mr. Elifritz was experiencing a mental health crisis, was under the influence of drugs, or both. Mr. Elifritz's death is a tragedy for all concerned, including Mr. Elifritz, his family, and the police officers and bystanders who were present at the scene. Notwithstanding its tragic nature, however, it is clear that the officers' use of deadly force under the unique circumstances of this case did not violate the Fourth Amendment or create a basis for a wrongful death claim under Oregon law.

# BACKGROUND

## A.     Before Elifritz Arrived at CityTeam

On April 7, 2018, John Elifritz ("Elifritz") called Portland Police Bureau ("PPB") at around 2:20 p.m.  Pl. Resp. Mot. Sum. J. ("Pl. Resp.") Ex. 1 at 1-2,[1] ECF 59-1.  He reported that someone had murdered his wife and child by slitting their throats, and he said that they were in a house across the street from a library.  *Id*. at 3.  He did not request police assistance, but he said that possible gang members had killed his family.  *Id*.  Officer Wuthrich, Officer Storm, Officer Kemple, and Officer Britt responded to the call.  As officers were in route, other people called PPB to report that Elifritz was screaming and exhibiting alarming behavior.  *Id*.  Officers responded to the duplex where Elifritz said that someone had murdered his wife and child.  *Id*.  A contractor at the duplex let the officers in to confirm that no one was injured inside.  *Id*.  The contractor told the officers that a "crazy" guy had been outside and had made him feel uncomfortable.  *Id*.  Other officers located Elifritz nearby.  *Id*.  Elifritz did not believe that the officers were police officers.  *Id*.  He refused to speak to them and put a knife to his own throat when officers tried to talk to him.  *Id*.  Elifritz told the officers that he would not hurt himself or anyone else and that he did not need help from the officers.  *Id*.  The officers decided to disengage and left Elifritz alone.  *Id*.

Officer Loomis completed a PPB "Mental Health Template" that described the encounter and included the subject "mental health."  *Id*.  Officers Wuthrich and Kemple also completed reports that described the incident and that were incorporated into Officer Loomis's mental health template.  Officer Wuthrich's report said that she responded to a report by Elifritz that his wife and daughter were dead in the townhomes across from the library.  *Id*. at 6.  Officer

---

[1] This exhibit is not page-numbered, so citations to this exhibit refer to the ECF page numbers.

Wuthrich pulled her patrol vehicle next to Elifritz, rolled down the window, and asked him to

stop. *Id*. Elifritz was sweating, yelling, and Officer Wuthrich could not understand what he said.

*Id*. When Officer Wuthrich told Elifritz that she needed to talk to him, he backed away from her

patrol vehicle and pulled a knife from his pocket. *Id*. Officer Wuthrich got out of her vehicle to

get her less lethal launcher[2] and heard someone say that Elifritz had put the knife to his own

throat. *Id*. Officer Wuthrich loaded her less lethal launcher as Elifritz ran away. *Id*. Officer

Wuthrich said that Officer Storm asked Elifritz if he wanted to hurt anyone, and Elifritz told

Officer Storm that he did not want to hurt himself or others. *Id*. At that point, another officer

ordered Officer Wuthrich to disengage because police presence seemed to agitate Elifritz further.

*Id*. After they disengaged with Elifritz, Officer Wuthrich and Officer Britt pulled their patrol

vehicles next to one another in a nearby park and were talking when a third vehicle pulled up.

*Id*. The driver of that vehicle said that a man nearby was "waving around a knife" and had tried

to get into his vehicle. *Id*. Officer Britt asked him if he wanted to report that he had been the

victim of an attempted carjacking. *Id*. The man said no and told the officers that he just wanted

them to know that it had happened. *Id*. Officer Wuthrich updated dispatch with that

information, and the officers decided to continue to disengage. *Id*. Officer Wuthrich completed

a report with a subject line that stated, "high subject with knife." *Id*.

Officer Kemple reported similar facts. Officer Kemple's "BHU referral" with the subject

line "mental health crisis" reported that when they encountered him, Elifritz was standing about

seventy-five yards away from the other officers and was not threatening anyone. *Id*. Officer

---

[2] Less lethal launchers shoot beanbags and other projectiles intended to "induce compliance by
causing sudden, debilitating, localized pain, similar to a hard punch or baton strike." *Deorle v.
Rutherford*, 272 F.3d 1272, 1277 (9th Cir. 2001). Beanbags are "rounds made of lead shot"
launched from a shotgun, and they can cause serious injuries or even death. *Id*.

Kemple also said that when police officers approached Elifritz, he pulled a knife and held it to his throat. *Id*. Officer Kemple reported that he kept his distance and did not approach Elifritz because other officers were trying to engage with him at that time. *Id*. Officer Kemple cleared the scene without contacting Elifritz. *Id*.

Officer Loomis completed the mental health template at 3:36 p.m. *Id*. at 3. Officer Kemple added his narrative to the report at 4:02 p.m., and Officer Wuthrich added hers at 6:14 p.m. *Id*. at 4-6. The report was approved that day, but the report does not reflect what time it was approved. *Id*. at 1. When a mental health template is approved, the computer dispatch system does not immediately notify all on-duty officers of the report. Volpert Decl. Ex. 6-A ("Foxworth Dep.") 25:12-20. An officer who wants to access the template would have to go into a specific program, enter the subject's name and date of birth, and retrieve it. *Id*. The filing of the report generates a flag for mental illness that attaches to the individual's name and appears when an officer enters the individual's information into a search. *Id*.

About two hours after the officers' encounter with Elifritz, at around 4:30 p.m., PPB received a report that a man had carjacked a vehicle in southeast Portland. Jones Decl. ¶ 5, ECF 37. The caller reported that a man had opened the driver side door of his daughter's silver SUV and forced her out of the vehicle while screaming, "they're going to kill somebody." Sheffield Decl. Ex 1 at 2-4, ECF 42-1. A few hours later, at 7:25 p.m., PPB received a report of a road rage incident. Jones Decl. ¶ 6. The caller reported that the driver of a silver vehicle with the license plate "ZRO 832" had chased the caller and anaother person after they had left a Wal-Mart store and tried to hit them. Sheffield Decl. Ex. 2 at 2:8-12, 4:2-3, ECF 42-1. The caller described the driver as a bald man wearing no shirt with tattoos on his body, and the caller said that the driver had something in his hand, but the caller could not see what it was. *Id*. at 3:6-7.

The caller told the dispatcher that he had a video of the driver, and the dispatcher told the caller that an officer would come to look at the video. *Id*. at 4:21-5:9. The dispatcher sent a report to officers through computer-aided dispatch ("CAD") that said, "5 AGO, L/S EB COLUMBIA RECKLESS AGGRESSIVE DRIVER IN 57 GRY HOND CRV OR/ZRQ832, MALE DRIVER NO SHIRT LOTS OF TATTOOS, COMP THINK DRIVER POINTED A GUN AT HIM, HAS VIDEO, WOULD LIKE CONTACT AT HIS HOME." Jones Decl. Ex. 13 at 1, ECF 37-1.[3]

About five minutes later, PPB received calls reporting that a man had crashed a silver Honda CRV at Southeast Martin Luther King, Jr. Boulevard and Southeast Stark Street. Jones Decl. ¶ 9, ECF 37; Jones Decl. Ex. 14 at 1, ECF 37. The dispatcher told officers that the crashed vehicle was the same vehicle that had been reported stolen earlier and the same vehicle that had been involved in the road rage incident where the driver was "flashing a gun." Sheffield Decl. Ex. 3 at 2:14-20, 4:13-22, ECF 42-1. The dispatcher notified officers that the suspect was either John Elifritz or another individual. *Id*. at 4:19-22. Officers began to perform an area check to look for the man who had crashed the car. *Id*. at 3:14-24. An officer identified on the dispatch transcript as K9-1 then notified dispatch that the video taken by the road rage victim "doesn't really show the guy. No gun actually seen. He was just reaching for something." *Id*. at 6:10-12. The dispatcher repeated over the radio that no gun had been involved in the carjacking. *Id*. at 6:18-21.

While officers continued to search the area, dispatch received another report at 7:49 p.m. The caller reported that a white man in his thirties to fifties with a graying goatee and a bald head was standing outside the doorway of the Jackson's convenience store on Southeast Grand Avenue holding a knife with a three to four-inch blade in his hand. *Id*. at 7:1-7, 9:4-6. The caller

---

[3] This exhibit is not page-numbered, so citations to this exhibit refer to the ECF page numbers.

also reported that the man appeared to be high on opiates.  *Id*. at 7:1-7.  Officers responded to

Jackson's and showed a Jackson's employee a picture of Elifritz.  *Id*. at 8:8-14.  The employee

confirmed that the man who had appeared with a knife was Elifritz.  *Id*.; Simpkins Decl. ¶ 7,

ECF 40.  The dispatcher advised officers over the radio that "a couple calls earlier today,"

Elifritz had held "a knife to his throat, was ranting about his wife and daughter being murdered.

We disengaged from that on East."  Sheffield Decl. Ex. 3 at 8:17-19.  Officer Fender completed

a record check after the Jackson's employee identified Elifritz and found the mental health

template completed by officers earlier that day.  Volpert Decl. Ex. 6-E ("Fender Dep.") 30:18-

24, 32:10-23, ECF 59-11.  Officer Phifer ran a record check to find a photo of Elifritz.  Volpert

Decl. Ex. 6-D ("Phifer Dep.") 45:7-8, ECF 59-10.  He did not look at the list of police

encounters and arrests involving Elifritz because he was driving at that time.  *Id*. at 45:21-46:18.

Dispatch then notified officers that "Medic 332" had just left Columbia Shelter, located at

509 Southeast Grand, and said that a male wearing a hoodie was standing outside the locked

door of the shelter holding a knife to his throat.[4]  *Id*. at 9:15-25.  Officer Nutting responded to

Columbia Shelter and reported to dispatch that Elifritz was no longer there.  *Id*. at 10:12-14;

Sheffield Decl. Ex. 5 ("Nutting Dep.") 39:9-20, ECF 42-1.

Outside Columbia Shelter, Deputy Simpkins, one of the officers who had responded to

Jackson's, heard people across the street outside CityTeam Ministries ("CityTeam")[5] shouting,

---

[4] That information was inaccurate.  Elifritz had in fact held a knife to the neck of a man standing
outside Columbia Shelter.  With the knife on the man's neck, Elifritz told the man that they were
going to go for a ride in the ambulance.  McKimmy Decl. ¶¶ 2, 5, ECF 38.  When the man got
away from Elifritz, he went inside Columbia Shelter and told a medic that Elifritz had a knife
and intended to hijack the ambulance.  *Id*. at ¶ 6.  Because the officers did not have that
information when they encountered Elifritz, the Court did not consider it in its Fourth
Amendment analysis.
[5] CityTeam Ministries is a city shelter.  Sheffield Decl. Ex. 3 at 10:24-11:6.

"He's over here."  Simpkins Decl. ¶ 9.  As officers approached, a person standing outside

CityTeam said that someone inside CityTeam was holding a knife to his own throat.  Fox Decl. ¶

10, ECF 34.  Deputy Sieczkowski, who was working with Deputy Simpkins,[6] saw a man

matching Elifritz's description standing inside CityTeam.  Sieczkowski Decl. ¶ 8, ECF 39.

Elifritz had a knife in his hand, and Deputy Sieczkowski saw blood on Elifritz's neck.  *Id*.  An

officer then notified dispatch, "I think he's in CityTeam across the street."  Sheffield Decl. Ex. 3

at 10:24-25.  Another officer reported to dispatch, "We got him inside," and said that Elifritz's

throat was bleeding heavily.  *Id*. at 11:3-9.  The dispatcher sent a medical unit to CityTeam to

render medical assistance.  *Id*. at 11:10-19.

### B.    After Elifritz arrived at CityTeam

Several nearby police officers ran to the entrance of CityTeam.  Sieczkowski Decl. ¶ 9.

People were running out of CityTeam, and one person told officers that Elifritz was trying to stab

people.  Simpkins Decl. ¶ 10; Cohen Decl. Ex. 19 ("Combined Video") 1:59-2:00, ECF 32-1.

Deputy Simpkins drew his handgun as he approached.  Simpkins Decl. ¶ 10.  People inside

CityTeam were backing away from Elifritz, and they appeared to be afraid of him.  Sieczkowski

Decl. ¶ 9; Combined Video 1:17-1:24.  Elifritz cut his neck several times before officers opened

the CityTeam doors.  Nutting Dep. 53:1-12; Combined Video 1:17-1:24.  When Deputy

Sieczkowski opened the door, Elifritz began to back away from the door into the right side of the

room.[7]  Nutting Dep. 53:13-18; Combined Video 2:19-2:22.  The officers did not immediately

---

[6] Deputy Sieczkowski is a Multnomah County Sheriff's Deputy, and Deputy Simpkins is a
Clackamas County Sheriff's Deputy; they are not PPB officers.  Sieczkowski Decl. ¶ 1;
Simpkins Decl. ¶ 1.
[7] All references in this Opinion to the left, right, front, and back (or rear) of the room refer to
those areas from the officers' perspective as they stood inside the CityTeam doorway facing into
the room.

enter CityTeam.  From the threshold of the doorway, Officer Damerville, who had a 40-millimeter less lethal launcher, shouted, "Hey, drop the knife or you're going to get bean bagged."  Combined Video 2:18-2:20; Sheffield Decl. Ex. 8 ("Damerville Dep.") 37:2-6, ECF 42-1.  Officers told Elifritz twice more that he would "get bean bagged" before firing any less lethal rounds.  Combined Video 2:24-2:25, 2:32-2:33.  While he was backing away from the doorway, Elifritz bumped into a man and grabbed the man's jacket.  Sieczkowski Decl. ¶ 10; Combined Video 2:19-2:22.  Sieczkowski thought that Elifritz would take the man hostage and radioed to other officers that there may be hostage situation.  Sieczkowski Decl. ¶ 11.  The man slipped away, and Elifritz moved toward the rear of the right side of the room from the officers' perspective.  *Id.*; Combined Video 2:19-2:20.  Officers told Elifritz to drop the knife and get down on the ground, but Elifritz did not comply.  *Id.* at 2:23-2:26.  An officer then told Elifritz, "If you come at everyone, you get shot.  Do you want to get shot?"  *Id.* at 2:35-2:39.  Officers continued to yell repeatedly at Elifritz to drop the knife and get on the ground.  Simpkins Decl. ¶ 14; Combined Video 2:20-2:39.

As Elifritz backed into the right side of the room, most of the bystanders moved to the left side of the room.  Combined Video 2:45-2:51.  The surveillance video shows that a short wall partially separated the back of the left and right sides of the room.  There was a stairway leading downstairs in the center of the front of the room.  The stairway was enclosed by walls that appear from the Court's estimation to be about five feet tall.  There was enough space between the end of the short wall in the back of the room and the enclosed stairwell in the front of the room to walk between the left and right sides of the room.  The right side of the room was arranged with several rows of chairs facing the back of the room where a table sat facing the rows of chairs, and the rows of chairs were divided down the center by an open aisle.  Most of

the chairs had been occupied by people when Elifritz entered CityTeam. Several chairs had been

bumped out of place and slid easily across the floor when the bystanders left their seats to get

away from Elifritz.

From the right side of the room, Elifritz moved toward the bystanders on the left side of

the room. *Id.* He walked to the space between the short wall and the wall that enclosed the

staircase while bystanders shoved chairs and other objects in his path to keep him away from

them. *Id.* at 2:51-2:55. Officers told the bystanders to go inside one of the rooms along the left

side of the room or get out of CityTeam. *Id.* at 2:55-3:04. Officers Bailey and Damerville shot

less lethal rounds at Elifritz several times. Damerville Dep. 37:2-6; Combined Video 2:53-2:54,

3:07-3:08, 3:19-3:21, 3:25-3:27, 3:46-3:48, 3:50-3:52; Sheffield Decl. Ex. 7 ("Bailey Dep.")

30:2-13, ECF 42-1; Sheffield Ex. 3 at 11:15-18. Elifritz was unphased by the less lethal rounds.

Sieczkowski Decl. ¶ 13; Fox Decl. ¶ 14. Although officers struck Elifritz with less lethal rounds

several times, he "remained in an athletic stance, still staring at [the officers] and holding the

knife." Sieczkowski Decl. ¶ 13; Combined Video 3:05-3:25.

For several seconds, Elifritz stood near the center of the room, between the enclosed

staircase and the short wall, focused on the officers standing at the threshold of the door. He

appeared to be taking cover from the less lethal rounds behind the wall surrounding the staircase.

Combined Video 3:25-3:50. At that point, officers began to enter CityTeam. *Id.* at 3:50-3:52;

Sheffield Decl. Ex. 9 ("Martiniuc Dep.") 16:4-7, ECF 42-1 at 100. The officers created a

semicircle formation inside the entrance and began to widen the formation along the left wall of

the room to position themselves between Elifritz and the bystanders, which allowed some

bystanders to get out of CityTeam. Martiniuc Dep. 16:19-24; Nutting Dep. 53:20-25. Officer

Gore, a K-9 officer, entered the room with a police canine, but did not use the canine against

Elifritz.  Gore Decl. ¶ 5, ECF 35.  As officers entered CityTeam, Elifritz walked back to the right

side of the room and positioned himself behind a pillar in the right rear corner of the room.

Combined Video 3:51-3:55.  Along with the pillar, positioned between Elifritz and the officers

were the table and the rows of chairs that bystanders had been sitting in before Elifritz entered

the room.  *Id*.

      At that point, several bystanders remained in the rear left corner of the room separated

from Elifritz only by the short wall.  *Id*.  After standing behind the pillar for several seconds,

Elifritz stepped out and took about five steps toward the officers, navigating around the pillar and

the table.  Combined Video 4:07-4:08.  When Elifritz passed the table and reached the open aisle

between the rows of chairs, he quickened his pace and began to run toward the officers, holding

the knife in front of him.  Combined Video 4:08-4:09.  Officers Nutting, Martiniuc, Phifer,

Polas, Fender, and Deputy Sieczkowski fired their weapons at Elifritz, and he fell to the floor.

Combined Video 4:09-4:12; Nutting Dep. 72:1-16; Martiniuc Dep. 29:12-22; Phifer Dep. 68:2-3;

Sheffield Decl. Ex. 10 ("Polas Dep.") 33:17-18; Sheffield Decl. Ex. 11 ("Fender Dep.") 60:3-5;

Sieczkowski Decl. ¶¶ 15-16; Volpert Decl. Ex. 4 at 4-5, ECF 59-4.  The gunshots lasted two to

three seconds.  Combined Video 4:09-4:12.  It appears from the Court's view of the video that

Elifritz came within a few seconds of reaching the nearest officers when they fired the first shot.

*Id*.  After the officers shot him, Elifritz rolled on the floor and came to rest face down with both

of his arms and the knife positioned under his body.  Elifritz died as a result of the shooting.

Volpert Decl. Ex. 4 at 4-5.  The time that had elapsed since officers had first appeared at the

CityTeam doorway until they shot Elifritz was just over two minutes, and the officers had

entered CityTeam only one minute and six seconds before they shot him.  Volpert Decl. Ex. 2;

Combined Video 2:04-4:10.

The officers acknowledged that Elifritz's behavior was unusual. Some of them could not tell whether he was having a mental health crisis. Damerville Dep. 24:10-17; Martiniuc Dep. 24:4-8. Some officers testified that he appeared to be struggling with a mental issue or having a mental health crisis. Phifer Dep. 44:17-20; Martiniuc Dep. 24:13-25. Other officers believed that he was under the influence of methamphetamine or other stimulants. Martiniuc Dep. 24:4-8; Bailey Dep. 26:4-16; Phifer Dep. 6:21-25; Polas Dep. 22:8-25; Fender Dep. 45:24-46:5. The officers testified that they were trying to isolate Elifritz from the bystanders, deescalate the situation, take him into custody, and get him the medical care that he needed. Axthelm Decl. ¶ 13, ECF 30; Damerville Dep. 24:1-6. Elifritz did not obey any of their commands. Axthelm Decl. ¶ 18.

A toxicology report confirmed the presence of amphetamine and methamphetamine in Elifritz's blood. Sheffield Decl. Ex. 16, ECF 42-2.

### C. City of Portland Training and Policies

#### i. Training

PPB officers attend a 16-week basic police academy taught by the state of Oregon that it requires all new law enforcement recruits in the state to attend.[8] After basic academy, PPB officers attend an advanced academy that PPB teaches and requires all PPB officers to attend. Sheffield Decl. Ex. 12 ("Gerritsen Dep.") 38:3-11, ECF 42-1. At basic academy, the officer defendants received Crisis Intervention Training, which included training to recognize mental health issues, identify mental crises, and learning how to communicate with people in an

---

[8] PPB may waive the requirement than an officer attend basic academy if the officer has attended an equivalent police academy in another state. Officer Fender had experience as a law enforcement officer in Nevada before PPB hired him, so he did not attend Oregon's basic academy. Instead, he took an equivalency exam and attended PPB's advanced academy. Fender Dep. 6:1-24.

elevated emotional state.  Damerville Dep. 5:18-23; Martiniuc Dep. 35:11-18.  They received

additional Crisis Intervention Training at advanced academy.  Gerritsen Dep. 38:22-24.  After

completing basic and advanced academy, PPB officers receive a cumulative total of forty hours

of mandatory Crisis Intervention Training.  *Id*. at 38:18-24.

     PPB also offers a forty-hour Enhanced Crisis Intervention Training course to officers on

a voluntary basis.  Gerritsen Dep. 39:1-2.  Officers Nutting and Damerville had received

Enhanced Crisis Intervention Training before the incident.  Nutting Dep. 90:20-91:1; Damerville

Dep. 5:15-17, 7:22-8:3.  PPB officers also receive in-service training at least annually, and

responding to mental health crises is often a topic of in-service training.  Phifer Dep. 47:2-7.  The

crisis intervention training offered during in-service trainings includes role-playing exercises that

require officers to work through scenarios involving people experiencing mental health issues.

*Id*. at 47:16-22.

     PPB trains its officers to use lethal force when there is an immediate threat of death or

serious physical injury to the officer or others.  Phifer Dep. 6:4-8; Damerville Dep. 78:4-9.

    *ii.*       *Policies*

     PPB's Policy No. 1010.00 establishes PPB standards for using force.  It requires officers

to use de-escalation techniques, when feasible, to avoid using force or reduce the force used to

arrest a subject.  Volpert Decl. Ex. 3 ("PPB use of force policy") at ¶ 5.  It also requires officers

to "attempt to avoid or minimize the use of force against individuals in perceived behavioral or

mental health crisis or those with mental illness and direct such individuals to the appropriate

services, where possible."  *Id*. at ¶ 6.  When practical and appropriate, officers should call

specialized behavioral health units to respond and "assist in de-escalating the situation or

devising a disengagement strategy or otherwise assist in safely resolving the incident."  *Id*. at ¶

1.1.2.  When engaging with a person who is not following officers' commands, officers should "consider whether a subject's lack of compliance is a deliberate attempt to resist or an inability to comply based on factors including, but not limited to: 1) medical conditions; 2) mental impairment; 3) developmental disability; 4) physical limitation; 5) language barrier; 6) drug or alcohol impairment; and 7) mental health crisis." *Id*. at ¶ 1.2.  The policy defines a "mental health crisis" as:

> An incident in which someone with an actual or perceived mental illness experiences intense feelings of personal distress (e.g., anxiety, depression, anger, fear, panic, hopelessness), a thought disorder (e.g., visual or auditory hallucinations, delusions, sensory impairment or cognitive impairment), obvious changes in functioning (e.g., neglect of personal hygiene) and/or catastrophic life events (e.g., disruptions in personal relationships, support systems or living arrangements; loss of autonomy or parental rights; victimization or natural disasters), which may, but not necessarily, result in an upward trajectory of intensity culminating in thoughts or acts that are dangerous to self and/or others.

*Id*. at 3.  When they engage with a person experiencing a mental health crisis, officers should consider de-escalation and disengagement techniques and create a response plan.  *Id*. at ¶ 1.3.

The PPB use of force policy states that "nothing in this policy requires a member to retreat or be exposed to possible physical injury before applying reasonable force."  *Id*. at 5. However, the policy states that it is more restrictive than state and federal laws.  *Id*.  The policy incorporates the requirements of *Graham v. Connor* and allows officers to use force to prevent or terminate the commission of a crime, suicide, or serious self-inflicted injury and to make an arrest, prevent an escape, or defend the officer and others.  *Id*. at ¶ 2.1.

PPB's use of force policy requires officers to first give a warning and, if the officer intends to use less lethal force, tell the subject that the officer intends to use it.  *Id*. at ¶ 3.  Less lethal force includes use of weapons like batons, less lethal launchers, and canines.  *Id*. at ¶ 6.4. Under the policy, officers may use less lethal launchers—referred to as impact munitions in the policy—to respond to active aggression, to prevent suicide or immediate harm, to avoid using a

higher level of force, and to prevent escape. *Id*. at ¶ 6.4.2. Officers may use canines to protect the officer, the canine, or the community from an immediate threat or to apprehend a subject. *Id*. at ¶ 6.4.5.

The policy permits officers to use deadly force "to protect themselves or others from what they reasonably believe to be an immediate threat of death or serious physical injury." *Id*. at ¶ 8.1. Officers must summon medical services at the earliest available opportunity after using deadly force and render aid within their training and skills until medical assistance arrives. *Id*. at 9.1. PPB categorizes deadly force as a "Category I" use of force, which triggers the investigative response outlined in Directive 1010.10.

Directive 1010.10, entitled "Deadly Force and In-Custody Death Reporting and Investigation Procedures," was in effect at the time of the incident. Bell Decl. ¶ 2, ECF 31. The policy establishes the procedure for investigating uses of deadly force by PPB police officers. The policy requires an internal affairs investigation of every use of deadly force and requires that investigation to take place concurrently with the underlying criminal investigation. *Id*. at ¶ 3. When the investigator completes the investigation, the investigator presents their findings to the Police Review Board, which consists of an assistant chief, two citizens, two officers, the Responsibility Unit Manager, and the Independent Police Review Director. *Id*. at ¶ 4. The Police Review Board advises the Chief of Police about whether the involved officer(s) complied with PPB policy and whether it recommends corrective action or additional officer training. *Id*. The Chief of Police then makes the final determination regarding whether the officers' conduct was within PPB policy and whether corrective or disciplinary action is necessary. *Id*. at ¶ 5.

///

///

### D.    The DOJ Report

In September 2012, the United States Department of Justice ("USDOJ") found that there was "reasonable cause to believe that PPB engages in a pattern or practice of unnecessary or unreasonable force during interactions with people who have or are perceived to have mental illness" and reported its findings to the City.  Volpert Decl. Ex. 7 ("USDOJ Report") at 1, ECF 59-15.  The USDOJ Report described the investigation that USDOJ conducted jointly with the United States Attorney's Office for the District of Oregon under the Violent Crime Control and Law Enforcement Act of 1994 ("the Act").  *Id*.  The Act authorizes the United States to take legal action against law enforcement agencies when there is reasonable cause to believe that an agency has engaged in a pattern or practice of constitutional violations.  *Id*.  The USDOJ Report found a "pattern of dangerous uses of force against persons who posed little or no threat and who could not, as a result of their mental illness, comply with officers' commands."  *Id*. at 2.  It also found that "PPB employs practices that escalate the use of force where there were clear earlier junctures when the force could have been avoided or minimized."  *Id*.  The USDOJ Report recommended several remedial measures, including additional officer training and policy revision aimed at (1) reducing the amount of force that PPB officers use during interactions with individuals in crisis, and (2) streamlining the investigation of uses of force and complaints of officer misconduct.  *Id*. at 40-41.

## EVIDENTIARY OBJECTIONS

Plaintiff objects to the declaration of Joshua Cohen and Exhibits 18-20 to Cohen's declaration, which are video files that Cohen prepared from the CityTeam surveillance footage and the audio file recorded by Officer Fox's Mobile Audio Video ("MAV") system.  Pl. Resp. 12.  Defendants rely on Cohen's declaration to establish two facts: (1) the speed that Elifritz

traveled toward officers before officers shot him; and (2) the distance between Elifritz and the nearest officer before and after officers fired their weapons at him. Cohen Decl. ¶¶ 17-20. Cohen's declaration also explains the process he used to combine the video footage from several camera angles with the MAV system audio recording to create a comprehensive video that synchronizes the available video and audio files in a single video. *Id*. at ¶¶ 4-12. Plaintiff objects to Cohen's declaration and Exhibits 18-20 under Fed. R. Civ. P. 26(a)(2)(B) and Fed. R. Evid. 702. Plaintiff does not allege that the videos inaccurately depict the events that occurred at CityTeam.

### A.    Rule 26 Objection

The Court did not impose a deadline for the parties to exchange expert reports and the other information required by Fed. R. Civ. P. 26(a)(2)(B). Rule 26 provides that unless otherwise ordered by the Court, the parties must disclose the information listed in Fed. R. Civ. P. 26(a)(2)(B) ninety days before trial. Fed. R. Civ. P. 26(a)(2)(D). When Defendants filed this motion in August 2019, trial was more than ninety days away, so Defendants were not yet required to provide the expert disclosures required by Rule 26. Even if Rule 26 required Defendants to disclose Cohen's opinions in August 2019, Defendants had provided Plaintiff the information that Rule 26 requires. Cohen's declaration describes the documents and videos that he reviewed, the software he used, and includes a statement of his opinions. Cohen Decl. ¶¶ 4-22. Attached to Cohen's declaration was a copy of his curriculum vitae, a list of cases he had testified in during the previous four years, and a list of presentations he had given. Cohen Decl. Ex. 17, ECF 32-1. Thus, to the extent that disclosure was required, Cohen's declaration and the attachments to it met the requirements of Fed. R. Civ. P. 26(a)(2)(B). In their reply, also filed more than ninety days before the then-existing trial date, Defendants provided Cohen's entire

report.  Cohen Decl. II Ex. 36, ECF 64.  Plaintiff's objections under Rule 26 to Cohen's

declaration and Exhibits 18-20 are overruled.

### B.        Rule 702 Objection

Plaintiff argues that for the Court to rely on an expert opinion to decide a motion for

summary judgment, the opinion must be admissible under Fed. R. Evid. 702.  Plaintiff argues

that Cohen's declaration and its attachments do not meet the admissibility requirements of Rule

702 because they do not qualify him as an expert and because Cohen's opinions are unreliable.

As a result, Plaintiff argues, the Court should not consider Cohen's opinions about the distance

between the people in the room at different points in time and Elifritz's speed as he approached

the officers.  The Court need not rely on the speed and distance calculations and related opinions

in Cohen's declaration to resolve this motion, so the Court declines to rule on Plaintiff's Rule

702 objections.

Exhibits 18-20 to Cohen's declaration do not contain opinions that are subject to Fed. R.

Evid. 702.  It does not require specialized education, experience, or training to use computer

software to line up an audio file and a video file and play them simultaneously, and the Court

does not require the opinion of an expert to determine whether the synchronization of those files

is accurate.  For those reasons and the reasons that the Court explained on the record, Plaintiff's

objections to Exhibits 18-20 under Rule 702 are overruled.

### STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact

and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The

moving party bears the initial responsibility of informing the court of the basis of its motion, and

identifying those portions of "'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (internal quotation marks omitted); *see also Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20, AFL-CIO v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985) ("Even where the basic facts are stipulated, if the parties dispute what inferences should be drawn from them, summary judgment is improper.").

///

## DISCUSSION

Defendants move for summary judgment on each of Plaintiff's claims. For the reasons explained in this Opinion, the Court grants Defendants' motion.

### I.    Section 1983 Claims Against the Officer Defendants

Plaintiff's section 1983 claims are based on Fourth Amendment violations stemming from the officer defendants' use of deadly force against Elifritz.

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law[.]

42 U.S.C. § 1983.

The officer defendants admit that they acted under color of state law and deny that they violated the Fourth Amendment when they used deadly force against Elifritz. To determine whether the force used by a police officer was excessive under the Fourth Amendment, the Court must determine whether the officers' actions were objectively reasonable under the totality of the circumstances. *Byrd v. Phoenix Police Dep't*, 885 F.3d 639, 642 (9th Cir. 2018); *Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010). The analysis must balance the intrusion on an individual's rights against the countervailing government interests at stake without considering the officers' underlying intent or motivations. *Graham v. Connor*, 490 U.S. 386, 396-97 (1989).

"The intrusiveness of a seizure by means of deadly force is unmatched" and implicates the highest level of Fourth Amendment protection. *Tennessee v. Garner*, 471 U.S. 1, 9 (1985); *Vos v. City of Newport Beach*, 892 F.3d 1024, 1031 (9th Cir. 2018). To determine the nature of the government interests at stake, the Court considers several non-exclusive factors, including:

(1) whether the suspect posed an immediate threat to anyone, (2) whether the suspect resisted or attempted to evade arrest, and (3) the severity of the crime at issue. *Graham*, 490 U.S. at 396; *Vos*, 892 F.3d at 1031. Whether a use of force was reasonable depends on the unique facts of each case and "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. Only information known to an officer at the time of the officer's conduct is relevant to the analysis. *Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546-47 (2017); *Glenn v. Wash. Cty.*, 673 F.3d 864, 873 n. 8 (9th Cir. 2011).

The most important *Graham* factor is whether the suspect posed an immediate threat to anyone's safety. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc). The use of deadly force is reasonable only if a suspect "poses a significant threat of death or serious physical injury to the officer or others." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014) (internal quotation marks omitted). Other relevant factors include "the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *S.B. v. Cty. of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017) (quoting *Glenn*, 673 F.3d at 872).

Officers are not "required to use the least intrusive degree of force possible" as long as the degree of force used is reasonable. *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994). Reasonableness is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Plaintiff bears the burden of proving that the force used was unreasonable. *Arpin v. Santa Clara Transp. Agency*,

261 F.3d 912, 922 (9th Cir. 2001).  Summary judgment "should be granted 'sparingly' in excessive force cases, particularly 'where the only witness other than the officers was killed during the encounter.'"  *S.B.*, 864 F.3d at 1014 (quoting *Gonzalez*, 747 F.3d at 795).  Whether the force used was objectively reasonable under the Fourth Amendment is a question of law. *Scott v. Harris*, 550 U.S. 372, 381 n. 8 (2007).

### A.    Use of Less Lethal Force

Officers Bailey and Damerville used only less lethal force against Elifritz.  They did not fire any weapons during the encounter other than their less lethal launchers.  Plaintiff conceded both in her response to Defendants' motion and at oral argument that her claim is based solely on the officer defendants' use of deadly force against Elifritz and that her claims against Officers Bailey and Damerville should be dismissed.  The Court thus dismisses Plaintiff's claims against Defendants Bailey and Damerville with prejudice.

### B.    Use of Deadly Force

Whether the use of deadly force was reasonable depends primarily on whether Elifritz posed an immediate threat of serious injury or death when the officers shot him.  The Court finds that Elifritz posed an immediate threat of serious injury or death to the officer defendants and that the officer defendants did not violate the Fourth Amendment when they used deadly force against Elifritz in response to that threat.

#### i.    *Immediate threat*

Defendants argue that Elifritz posed an immediate threat of serious injury or death to the officers when they used deadly force against him because he was running toward the officers with a knife.  Plaintiff argues that, despite the existence of a video, a question of fact remains about whether the threat posed by Elifritz was immediate.  Specifically, Plaintiff argues that the

threat was not immediate because of the distance between Elifritz and the officers and because there were "barriers in the form of furniture, walls and pillars" in the space between Elifritz and the officers.  Pl. Resp. 18.  Plaintiff also points out that Elifritz was not within arm's reach of anyone and was on the other side of the short wall from the bystanders when the officer defendants shot him, so he could not have reached out and injured anyone with the knife.  *Id*. The threat was not immediate, according to Plaintiff, because the officers had less lethal launchers, TASERS, and a canine and had the "ability to disengage, withdraw and move around the room" to de-escalate the situation using the techniques described in PPB's use of force policy.  *Id*.  Finally, Plaintiff argues that the officers "created the conditions which caused Mr. Elifritz to move toward them, by provoking him with ineffectual use of less-than-lethal rounds and by failing to proactively de-escalate the situation."  Pl. Resp. 10.

Possession of a dangerous weapon alone does not automatically justify the use of deadly force, but threatening behavior coupled with the possession of a dangerous weapon can create an immediate threat of serious injury or death that justifies the use of deadly force.  *Glenn*, 673 F.3d at 873; *Long v. City and Cty. of Honolulu*, 511 F.3d 901, 905 (9th Cir. 2007) (suspect who raised a rifle and shouted a threat posed immediate threat of serious injury or death); *Blanford v. Sacramento Cty.*, 406 F.3d 1110, 1116 (9th Cir. 2005) (suspect who ignored officers' commands, raised a two and a half foot sword, growled, and headed for a house posed an immediate threat of serious injury or death); *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2003) (When a person is armed, "a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat."); *Scott v. Henrich*, 39 F.3d 912, 914-15 (9th Cir. 1994) (suspect who opened a door and pointed a long gun at officers posed an immediate threat of serious injury or death).

The surveillance video shows the basic facts, which are not in dispute.[9]  The officer defendants here were not confronted with a person who possessed a dangerous weapon in a non-threatening manner.  When the officer defendants confronted Elifritz holding a knife, a bystander had told them that he had tried to stab someone with the knife, he was inside a room with other people, and he was behaving erratically and cutting himself with the knife.  Officers saw him try to grab a bystander while holding the knife, and then he charged at officers with the knife.  Thus, Elifritz's threatening behavior while he held the knife created a sufficient threat for the officers to respond with deadly force.

Although some bystanders had been able to hide in other rooms or leave CityTeam, relocating to another room of the shelter did not eliminate the threat to those bystanders.  In addition, there were still several bystanders in the left side of the room with Elifritz, and some bystanders remained on the right side of the room near where Elifritz stood behind the pillar.[10]  When officers shot him, Elifritz had closed some of the distance between himself and the officers by running up the aisle between the rows of chairs in the right side of the room, and he was only seconds short of reaching the officers with his knife when they fired the first shot.  Any

---

[9] Video footage does not eliminate all questions of fact.  *See Scott*, 550 U.S. at 380-81 (On summary judgment, when the facts are captured on video, courts should view the facts "in the light depicted in the videotape."); *Vos*, 892 F.3d at 1028 ("The mere existence of video footage of the incident does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that footage.").

[10] The surveillance video shows that one bystander had taken cover behind the piano on the right side of the short wall dividing the back of the room.  In addition, at least one bystander entered a room through a door on the right side of the main room located just a few feet away from where Elifritz stood behind the pillar before he charged the officers.  Combined Video 3:33-3:48 (shelter rear camera).

reasonable officer would have concluded under those circumstances that Elifritz posed an immediate threat of serious injury or death to the officers when they shot him.[11]

Plaintiff's argument that Elifritz did not create an immediate threat of serious injury or death fails to account for the fact that Elifritz was running toward the officers with the knife when they shot him. Had the officers shot Elifritz when he stood behind the pillar, the Court may be inclined to agree that Elifritz did not pose an immediate threat of serious injury or death to the officers and bystanders. But circumstances changed when Elifritz ran toward the officers with the knife. At that point, Elifritz was closing the distance between himself and the officers quickly, and except for a few errant objects and chairs that Elifritz moved aside with ease, nothing stood between Elifritz and the officers. Those circumstances elevated the threat to an immediate threat of serious injury or death to the officers. *See City and Cty. of San Francisco v. Sheehan*, 575 U.S. 600, 135 S. Ct. 1765, 1775 (2015) ("it is reasonable for police to move quickly if delay 'would gravely endanger their lives or the lives of others.'") (quoting *Warden, Md. Peniten. v. Hayden*, 387 U.S. 294, 298-99 (1967)).

Contrary to Plaintiff's assertion, there is no evidence in the record that any non-lethal methods would have been effective in stopping Elifritz's charge. Two police officers each had shot several rounds from less lethal launchers at Elifritz with no appreciable effect before he charged the officers. Other officers considered using a TASER and a police canine but decided that those methods would have been ineffective or would have risked injuring bystanders.[12]

---

[11] That is exactly what the officers who confronted Elifritz concluded. Each of the officers who used deadly force testified that they fired their weapons at Elifritz because they thought that Elifritz would try to stab an officer with the knife. Nutting Dep. 72:1-16; Martiniuc Dep. 29:12-22; Phifer Dep. 68:2-3; Polas Dep. 33:17-18; Fender Dep. 60:3-5; Sieczkowski Decl. ¶¶ 15-16; Volpert Decl. Ex. 4 at 4-5.

[12] Officer Gore decided not to use his canine because he worried that with so many people in the room, the canine might bite the wrong person. Gore Decl. ¶ 6. Officer Gore considered using a

Even if other options for responding to the threat posed by Elifritz were possible, that face alone does not make the officer defendants' use of deadly force unreasonable.  When Elifritz started running toward them with the knife, the Fourth Amendment required only that the officer defendants' use of deadly force be objectively reasonable under a totality of the circumstances. The Fourth Amendment did not require the officer defendants to retreat, try to use less than lethal launchers again, protect themselves with chairs, or use any of the other methods argued by Plaintiff.  *See Forrester*, 25 F.3d at 807 (Officers are not "required to use the least intrusive degree of force possible."); *Graham*, 490 U.S. at 396-97 (the analysis must consider that officers are forced to make decisions in "tense, uncertain, and rapidly evolving" situations).

Plaintiff's argument that Elifritz did not pose an immediate threat of serious injury or death relies heavily on *Glenn v. Wash. Cty*.  In *Glenn*, police officers responded to a home where an intoxicated teenager armed with a pocketknife had threatened to kill himself.  673 F.3d at 867. The teenager's parents and two of his friends were standing next to the teenager when officers arrived and told the officers that the teenager had not threatened anyone else.  *Id*. at 868.  The officers instructed the teenager's parents to go into the house and told his friends to get behind the officers.  *Id*. at 873-74.  The teenager ignored the officers' commands to drop the knife, but otherwise stood still and did not threaten anyone.  *Id*. at 873.  While the teenager stood there, officers deployed beanbag rounds at him to try to get him to drop the knife.  *Id*. at 873-74.  At that point, the teenager began to run away from the officers toward the house, and the officers shot him.  *Id*. at 874.  The court held that a question of fact existed as to whether the teenager

---

TASER, but he thought that it would have been ineffective because Elifritz was too far away.  *Id*. at ¶ 7.  Officer Bailey also considered using a TASER, but he did not believe that it was the appropriate tool under the circumstances.  Bailey Dep. 29:20-30:7.  Officer Phifer agreed that using a TASER would not have been feasible under the circumstances.  Phifer Dep. 32:4-9.

posed an immediate threat to anyone when the officers deployed beanbag rounds at him because "[n]o new action by [the teenager] precipitated the use of less-lethal force." *Id*. In considering the other *Graham* factors, the court noted that police were called to help the teenager, not to respond to any crime committed by him, and he was not actively trying to flee or evade arrest when officers deployed beanbag rounds at him, even though he refused to comply with the officers' commands. *Id*. at 874-75.

 The facts of this case differ from the facts of *Glenn* in significant respects. Rather than responding to a call to help Elifritz, the officer defendants were responding to serious crimes that he had committed, including the carjacking and road rage incidents earlier in the day and the bystander's report that Elifritz had tried to stab someone. No similar facts were present in *Glenn*. After officers responded, the teenager in *Glenn* had stood still and threatened no one but himself with the knife. In contrast, based on the bystander's report, the officer defendants reasonably believed that Elifritz had tried to stab people, saw Elifritz try to grab a bystander in the room while holding the knife, and Elifritz then ran toward officers with the knife before the officers used deadly force against him. Unlike the facts of *Glenn*, there was not an officer between Elifritz and all the bystanders, and the bystanders appeared to feel threatened by Elifritz and tried to get away from him. Elifritz actively resisted arrest by refusing to comply with officers' commands and running toward them with a knife. Consequently, *Glenn* does not establish that the officer defendants' use of deadly force was unreasonable under the facts of this case.

 Plaintiff also relies on *Vos*, which suffers from similar critical factual distinctions. In *Vos*, police responded to a call that a schizophrenic man had become agitated in a 7-Eleven store. 892 F.3d at 1028. Someone in the store had reported that Vos had been yelling, held a pair of scissors, and the person said that there were still people in the store. *Id*. at 1029. The officers

evacuated the store and learned that a clerk had received a small cut on the clerk's hand when the clerk tried to disarm Vos. The officers positioned two police cars outside the convenience store entrance in a "v" formation and used them for cover. *Id.* The officers had less lethal launchers, a canine, and firearms at the scene. *Id.* They propped open the doors of the convenience store so that they could communicate with Vos, who was alone in a back room of the store, but they did not tell him to come out or otherwise try to communicate with him. *Id.* The officers knew that Vos was agitated and may have been mentally unstable or under the influence of drugs. *Id.* About twenty minutes after officers arrived, Vos came out of the back room, walked to the front of the store holding an object in his hand over his head, and started running toward the open doors. *Id.* He was about thirty feet from officers at that time. *Id.* Officers twice told him to drop the weapon, but he kept running toward the officers with the object overhead. *Id.* One officer shouted, "shoot him," and the officer with a less lethal launcher fired at Vos, along with two other officers who fired their firearms at him. *Id.*

Analyzing the government interests under *Graham*, the court noted that officers had been called to address Vos's erratic behavior, not to respond to a crime, and that Vos had little opportunity to flee. *Id.* at 1031. The court also noted that he was not resisting arrest while officers staged outside the store because officers did not try to communicate with him or give him any commands. *Id.* The court found that a question of fact remained about whether Vos was an immediate threat to the officers because: (1) officers had the front door of the store surrounded and had taken cover behind their police vehicles; (2) officers outnumbered Vos eight to one; (3) officers saw something in Vos's hand, but they knew it was not a gun; (4) officers had less lethal launchers available to stop Vos from charging. *Id.* at 1032.

The court in *Vos* distinguished the case from *Lal v. California*, in which it had found the use of deadly force reasonable where Lal, who was "intent on 'suicide by cop,'" had "forced the issue by advancing on the officers" with a football-sized rock. *Id.*  The court in *Lal* held that the officers did not have to endanger their own lives by allowing Lal to continue to advance on them. *Lal v. California*, 746 F.3d 1112, 1114 (9th Cir. 2014).  The *Vos* court distinguished *Lal* for three reasons: (1) the officers who confronted Lal did not have less lethal means available, and those who confronted Vos did; (2) Lal had committed serious crimes that showed that he was a danger to others, and Vos had not; and (3) Vos was surrounded, and Lal was not.  *Vos*, 892 F.3d at 1033. The *Vos* court also emphasized that there was no evidence that less lethal force would not have subdued Vos.  *Id.*

Contrary to Plaintiff's assertion, the facts here distinguishable from those in *Vos* for the same reasons that the facts of *Vos* are distinguishable from *Lal*.  In *Vos*, it was undisputed that officers had less lethal force available, and there was no evidence to suggest that it would not have worked.  *Id.* at 1034.  Here, the officer defendants had used less lethal force, and they knew that it would be ineffective against Elifritz.  Elifritz had a knife, was close to bystanders, ignored officers' commands, and officers did not have a formation of vehicles for cover to protect themselves from Elifritz's charge.  Under those circumstances, any reasonable officer would have believed that Elifritz posed an immediate threat of serious injury or death to the officers.

   ii.  *Severity of the crime*

Before officers confronted Elifritz in CityTeam, he had committed a string of serious offenses.  Earlier in the day, he had pulled a woman from her car, stolen the car, driven it recklessly, and endangered two other people with the car.  Those crimes amount to multiple felonies under Oregon law.  *See*, *e.g.*, Or. Rev. Stat. § ("O.R.S.") 164.055 (first-degree theft);

O.R.S. 163.165 (third-degree assault). Elifritz then crashed the stolen vehicle, fled the scene, and stood outside a convenience store with a knife. When officers located Elifritz, someone told the officers that Elifritz was trying to stab people. Those are serious crimes that gave the officer defendants an objectively reasonable belief that Elifritz would endanger other people in the room and provided a basis for the officer defendants to use force against him. Plaintiff does not argue that the crimes that Elifritz committed earlier in the day were not severe.

      *iii.*       *Resist or attempt to evade arrest*

The final *Graham* factor, whether Elifritz had resisted or attempted to evade arrest, also supports officers' use of deadly force. Plaintiff does not argue that Elifritz was not trying to evade or resist arrest when the officer defendants shot him. To determine whether an officer's use of deadly force was reasonable, the Court considers the degree of resistance or attempt to evade arrest in relation to the force used. For example, the Ninth Circuit has suggested that it may not be reasonable to use a high degree of force in response to passive forms of resistance such as refusing to obey officers' commands. *Bryan*, 630 F.3d at 830 (although "passive resistance" can support the use of force, "the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance."); *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (suspect's refusal to obey commands and brief period of physical resistance were not "particularly bellicose" because suspect did not try to flee or physically attack officers). When the degree of resistance escalates to the level of attacking an officer, a high degree of force is reasonable. *Sheehan*, 135 S. Ct. at 1775 (holding that the use of deadly force was reasonable when individual came within a few feet of an officer with a knife); *Garner*, 471 U.S. at 11 (officer may use deadly force to prevent escape if the suspect threatens the officer with a weapon.).

Elifritz was uncooperative when the officers confronted him at CityTeam.  When the officers arrived, Elifritz failed to follow their commands or submit to arrest.  Officers made several unsuccessful attempts to gain his compliance with their commands and less intrusive methods of force, but Elifritz attacked them with a knife.  The high degree of resistance by Elifritz and the threat he posed to officers thus supports the officer defendants' use of deadly force.

> iv.    *Whether a lesser degree of force was available*

When Elifritz did not comply with officers' commands to drop the knife, the officers escalated the level of force they used against Elifritz from verbal to physical force by shooting rounds from less lethal launchers at him.  Officer Damerville testified that he used less lethal force, in part, to avoid using a greater degree of force.  Damerville Dep. 37:3-14.  Several officers considered using a TASER but thought that it would not be feasible under the circumstances.  Gore Decl. ¶ 7; Bailey Dep. 29:20-30:7; Phifer Dep. 32:4-9.  Officer Gore, the K-9 unit on scene, considered whether using the canine to arrest Elifritz would have been reasonable.  Gore Decl. ¶¶ 5-6.  At that time, there were several bystanders in the room with Elifritz, and some bystanders were running from the room.  Under those cirumstances, Officer Gore concluded that the risk that the canine would make a mistake and attack a bystander instead of Elifritz was too high to justify releasing the canine.  *Id*. at ¶ 6.

The evidence shows that the officers used force in graduating degrees, each time considering whether less force would have been adequate or effective under the circumstances.  They tried to subdue Plaintiff with less lethal launchers, but the less lethal launchers were ineffective.  Plaintiff has offered no evidence to create a question of fact concerning whether a

lesser degree of force would have been reasonable under the circumstances. Like the other *Graham* factors, this factor also supports officers' use of deadly force under the circumstances.

> v.        *Warnings*

One factor a court may consider when determining whether the force used was reasonable under the Fourth Amendment is whether officers warned the subject before using force. *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001) ("[W]arnings should be given, when feasible, if the use of force may result in serious injury, and . . . the failure to do so is a factor to be considered in applying the *Graham* balancing test."). Here, between repeated commands that instructed Elifritz to drop the knife and get on the floor, officers warned Elifritz that if he did not drop the knife, he was "going to get bean bagged." Combined Video 2:33. They also warned Elifritz: "If you come at everyone, you get shot. Do you want to get shot?" *Id*. at 2:35-2:39. Elifritz received those warnings about a minute and a half before officers shot him. In the interim, officers continued to tell him to "drop the weapon" and "drop the knife" and shot less lethal rounds at him. Plaintiff does not argue that the warnings the officers gave to Elifritz were inadequate.

In *Deorle*, the Ninth Circuit held that police officers violated the Fourth Amendment when they shot a man who was "walk[ing] in the direction of an officer at a steady gait with a can or bottle in his hand." *Id*. The court held that deadly force was unreasonable under the circumstances because the officer did not order the man to stop, tell the man to drop the bottle, or warn the man that the officer would shoot the man if he did not stop, even though there "was ample time to give that order or warning and no reason whatsoever not to do so." *Id*.

Here, officers warned Elifritz several times that they would use less lethal launchers against him if he did not drop the knife. They also warned Elifritz once that he would "get shot"

if he "c[a]me at everyone."  To the extent that additional warnings were desirable, it was not feasible for the officer defendants to warn Elifritz a second time before using deadly force because Elifritz was running toward them with a knife and would have reached them quickly if officers did not immediately stop him.  Accordingly, this factor does not alter the Court's conclusion that it was reasonable for officers to use deadly force against Elifritz.

      *vi.*     *Emotional disturbance*

Plaintiff essentially argues that a different reasonableness standard should apply when an officer uses force against a person experiencing a mental health crisis.  Whether a person suffers from emotional disturbance is relevant to the Fourth Amendment analysis, but it is not dispositive.  *Glenn*, 673 F.3d at 876; *Deorle*, 272 F.3d at 1283 ("[W]e emphasize that where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham,* the reasonableness of the force employed.").  However, the Ninth Circuit has "refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals."  *Bryan*, 630 F.3d at 829; *Deorle*, 272 F.3d at 1283.  When police use deadly force against a person who has committed serious crimes and presents an immediate threat of serious injury or death to others, the presence of emotional disturbance does not reduce the governmental interest in using deadly force.  *See Sheehan*, 135 S. Ct. at 1775; *Lal*, 746 F.3d at 1117-18 ("[t]he fact that Lal was intent on 'suicide by cop' did not mean that the officers had to endanger their own lives by allowing Lal to continue in his dangerous course of conduct.").

In *Sheehan*, officers responded to a group home to transport a mentally ill woman, who had threatened staff at the group home with a knife, to a mental health treatment facility.  135 S. Ct. at 1770.  When the officers opened the door to her room, the woman, who was alone in her

room, threatened the officers with the knife.  *Id*.  The officers used pepper spray to prevent the woman from harming them as they entered her room, but the pepper spray was not effective.  *Id*. at 1771.  As the officers sprayed pepper at her face, the woman continued to move toward the officers with the knife, so they shot her when she was a few feet away.  *Id*.  The Supreme Court held that the officers' use of deadly force was reasonable under those circumstances.  *Id*. ("Nothing in the Fourth Amendment barred [the officers] from protecting themselves[.]").

The facts here are not significantly different from the facts of *Sheehan*.  Here, officers confronted Elifritz, who they believed may have been experiencing a mental health crisis, and they tried to use a lower degree of force unsuccessfully until Elifritz charged them with a knife. Officers shot Elifritz when he was within seconds of reaching the officers with the knife.  Under those circumstances, the officer defendants' use of force was reasonable, even if Elifritz was experiencing a mental health crisis.  *Id*.

vii.    *Provocation*

Plaintiff argues that officers provoked Elifritz's charge by shooting less lethal rounds at him.  According to Plaintiff, when the officers shot Elifritz with less lethal rounds, they "created the conditions which caused Mr. Elifritz to move toward them by provoking him with [the] ineffectual use of less-than-lethal rounds and by failing to proactively de-escalate the situation." Pl. Resp. 10.  Plaintiff did not develop that argument in her response to Defendants' motion.  The Supreme Court has rejected the theory that police conduct that "created a situation which led to the use of force" can form the basis of an excessive force claim when the resulting use of force was reasonable under *Graham*.  *Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1548 (2017) (rejecting provocation theory and holding that a reasonable use of force did not give rise to an excessive force claim even if it resulted from a warrantless search because courts must

independently analyze each Fourth Amendment violation under *Graham*).  Thus, Plaintiff's

provocation argument fails to establish that the officer defendants' use of force was excessive

under the Fourth Amendment.

viii.        *PPB De-escalation Policy*

Rather than use less lethal launchers, Plaintiff argues, the officer defendants should have

used the de-escalation techniques described in PPB's use of force policy.  Violation of police

policy does not establish section 1983 liability unless the violation of the policy also violated a

federal constitutional right. *Cf. Cousins v. Lockyer*, 568 F.3d 1063, 1070 (9th Cir. 2009) (section

1983 liability does not arise from violating prison policy; the plaintiff must prove that the prison

official violated a constitutional right); *Manzanillo v. Jacquez*, 555 F. App'x 651, 653 (9th Cir.

2014) (mem.) (affirming summary judgment on the plaintiff's claim that the defendants violated

prison policy when violation of policy did not violate a federal right).  Still, police policy may be

relevant to determining whether a use of force was excessive, but "only when one of [the

policy's] purposes is to protect the person against whom force is used." *Scott*, 39 F.3d at 915-16.

If the policy is designed only to protect police officers or the public, it is not relevant to the

analysis. *Id*. at 916 (A defendant "can't complain about the violation of a rule not intended for

his benefit.").

The PPB use of force policy requires officers to use de-escalation techniques "when time

and circumstances reasonably permit."  Volpert Decl. Ex. 3 at ¶ 1.1.  It provides that "[m]embers

shall take proactive steps to eliminate the immediacy of the threat, establish control and

minimize the need for force." *Id*.  The policy lists the following de-escalation methods:

> 1) using verbal techniques to calm an agitated subject and promote rational decision
> making; 2) allowing the subject appropriate time to respond to direction; 3)
> communicating with the subject from a safe position using verbal persuasion,
> advisements, or warnings; 4) decreasing exposure to a potential threat by using

distance, cover, or concealment; 5) placing barriers between an uncooperative subject and an officer; 6) ensuring there are an appropriate number of members on scene; 7) containing a threat; 8) moving to a safer position; and 9) avoiding physical confrontation, unless immediately necessary.

*Id*. at ¶ 1.1.1.  The policy provides that "when practical and appropriate," officers should call specialized units or consultants to assist with de-escalating the situation and should "establish and maintain [one-on-one] communication with the subject and avoid giving simultaneous directions or having multiple members verbally engaging the subject to avoid confusion."  *Id*. at ¶¶ 1.1.2-1.1.3.  In addition, officers should "consider whether a subject's lack of compliance is a deliberate attempt to resist or an inability to comply based on other factors, including but not limited to: 1) medical conditions; 2) mental impairment; 3) developmental disability; 4) physical limitation; 5) language barrier; 6) drug or alcohol impairment; and 7) mental health crisis."  *Id*. at ¶ 1.2.

The policy's stated purpose of "taking steps to minimize the use of force" shows that at least one purpose of the policy is to protect members of the public from excessive force, so it is relevant to the Court's analysis.  *See Scott*, 39 F.3d at 915-16.  However, even if the officer defendants violated a PPB policy during their encounter with Elifritz, which Plaintiff has not established,[13] any PPB policy violation that may have occurred when the officer defendants shot Elifritz does not establish a Fourth Amendment violation under the facts of this case.  There is no evidence, beyond Plaintiff's unsupported argument, that verbal techniques would have calmed

---

[13] The policies Plaintiff relies on include qualifiers such as "when time and circumstances reasonably permit" and "when practical and appropriate" to clarify when officers should use de-escalation techniques.  Plaintiff has not tried to establish that any of the techniques would have been "practical and appropriate" under the circumstances present here, where Elifritz was running toward officers with a knife.  In addition, PPB's use of force policy does not require officers to use de-escalation techniques in response to an imminent threat of serious injury or death: "[N]othing in this policy requires a member to retreat or be exposed to possible physical injury before applying reasonable force."  Volpert Decl. Ex. 3 at 5.

Elifritz, caused him to behave rationally or cooperate, or that using distance, cover, barriers, or

other methods to isolate Elifritz were viable options. *See Lal*, 746 F.3d at 1117 (rejecting

argument that officers should have used methods to de-escalate the situation when "Lal forced

the issue by advancing on the officers" and threatened them with a rock from seven or eight feet

away). Officers had just over two minutes from the time that bystanders alerted them to

Elifritz's presence inside CityTeam until he charged the officers with the knife to assess the

scene, isolate him from the bystanders, and develop a plan. When Elifritz charged the officers,

they were still trying to isolate him from the bystanders. Under those circumstances, the officer

defendants were not required to respond to the imminent threat posed by Elifritz with verbal

techniques, cover, or retreat. *See Sheehan*, 135 S. Ct. at 1775. As a result, even if a violation of

PPB policy occurred, the policy violation does not establish that the officer defendants

committed a constitutional violation when they shot Elifritz.

      *ix.*     *Conclusion*

      Viewing the facts in the light depicted in the videotape and drawing all reasonable

inferences in Plaintiff's favor, there is no genuine dispute of fact that the officer defendants' use

of deadly force against Elifritz was reasonable under the circumstances. Elifritz had committed

serious crimes, did not respond to officers' commands, behaved erratically, did not respond to

the use of less lethal force, and attacked the officers with a knife minutes after a bystander told

the officers that Elifritz had tried to stab people. As a result, Elifritz posed an immediate threat

of serious injury or death to the officers, and it was reasonable for the officers to respond with

deadly force, even if Elifritz was experiencing a mental health crisis. No reasonable juror could

conclude otherwise from the evidence in the record. The officer defendants did not violate the

Fourth Amendment when they shot Elifritz, so they are entitled to summary judgment on Plaintiff's section 1983 claim.

## II.    Qualified Immunity

The officer defendants are also entitled to summary judgment because they are entitled to qualified immunity. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (alterations and internal quotation marks omitted). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam).

Although existing cases need not be "directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White*, 137 S. Ct. at 551 (internal quotation marks omitted). Qualified "immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted). The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Sheehan*, 135 S. Ct. at 1775-76 (quotation marks omitted); *see also Brosseau*, 543 U.S. at 198-99. "General excessive force principles, as set forth in *Graham* and *Garner*, are 'not inherently incapable of giving fair and clear warning to officers,' but they 'do not by themselves create clearly established law outside [of] an obvious case.'" *S.B.*, 864 F.3d at 1015 (quoting *White*, 137 S. Ct. at 551).

"[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix*

*v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (internal quotation marks omitted).  Use of

excessive force is an area of the law "in which the result depends very much on the facts of each

case," and thus police officers are entitled to qualified immunity unless existing precedent

"squarely governs" the specific facts at issue.  *Id*. at 309 (internal quotation marks omitted and

emphasis deleted).  Cases involving similar facts can help move a case beyond the otherwise

"hazy border between excessive and acceptable force" and provide notice to a police officer that

a specific use of force is unlawful.  *Id*. at 312 (internal quotation marks omitted).

"When constitutional guidelines seem inapplicable or too remote, it is insufficient for a

court simply to state that an officer may not use unreasonable and excessive force, deny qualified

immunity, and then remit the case for a trial on the question of reasonableness."  *Kisela v.*

*Hughes*, 138 S. Ct. 1148, 1153 (2018).  An officer "cannot be said to have violated a clearly

established right unless the right's contours were sufficiently definite that any reasonable official

in the defendant's shoes would have understood that he was violating it."  *Plumhoff v.*

*Rickard*, 572 U.S. 765, 778-79 (2014).

As discussed in Part I above, the officer defendants did not violate Elifritz's Fourth

Amendment rights when they used deadly force against him.  As a result, the officer defendants

are entitled to qualified immunity.  Even if the officers' use of deadly force had violated the

Fourth Amendment, however, the officer defendants still would be entitled to qualified immunity

because no precedent squarely governs the facts they faced and, as a result, the right was not

clearly established.  The officer defendants faced a man who had carjacked a vehicle, engaged in

aggressive road-rage style driving, crashed the vehicle he stole, and had, according to a

bystander, tried to stab people inside the shelter.  The officer defendants also personally observed

Elifritz behave erratically while wielding a knife that he had used to cut himself inside the

crowded shelter.  In the two minutes that officers had to try to arrest Elifritz before he charged

them, Elifritz tried to grab a bystander, creating the appearance that he was trying to take a

hostage, and did not respond to officers' commands or their use of less lethal launchers.  Against

that backdrop, and with several bystanders in the room, the officer defendants had to make a

split-second decision about what to do when Elifritz began to run toward them with the knife.

No Fourth Amendment case "squarely governs" those facts or establishes that only an

incompetent officer or one who knowingly violated Elifritz's Fourth Amendment rights would

have used deadly force under the circumstances.

In *Kisela v. Hughes*, police had received reports that a woman was hacking a tree in a

neighborhood with a kitchen knife.  138 S. Ct. at 1151.  When police responded to the area, a

bystander pointed out the direction that the woman had walked away and described the woman

to the officers.  *Id*.  A few minutes later, police noticed a woman standing next to a car parked in

the driveway of a home surrounded by a locked chain link fence.  *Id*.  A second woman who

matched the subject's description walked out of the home holding a knife and stopped within six

feet of the woman standing next to the car.  *Id*.  The three officers drew their weapons and

ordered her to drop the knife.  *Id*.  The woman appeared to be calm but ignored their commands.

*Id*.  An officer then shot the woman holding the knife because he feared for the safety of the

woman standing next to the car.  *Id*.  The Supreme Court held that those circumstances were "far

from an obvious case in which any competent officer would have known that shooting [the

woman] to protect [the woman standing next to the car] would violate the Fourth Amendment."

*Id*. at 1153.

Similarly, in *Reese v. Cty. of Sacramento*, the Ninth Circuit held that officers who shot a

man in his apartment did not violate any clearly established right.  888 F.3d 1030, 1038 (9th Cir.

2018).  The officers had received a report that a man had fired a weapon outside his apartment and was inside his apartment with a knife.  *Id*. at 1035.  When officers knocked on his apartment door, the man flung open the door with a knife raised.  *Id*.  One of the officers fired a rifle at the man, and the man backed into the apartment out of the officers' sight.  *Id*. Another officer, who thought that the round from the rifle had hit the man, went inside and found the man still standing, which surprised the officer.  *Id*.  The officer could not see the man's hands, so he fired his handgun at the man's chest several times from about three away.  *Id*.  The Court held that the officers' conduct did not violate any clearly established right.  *Id*. at 1039-40.

The facts here made it even less clear to the officer defendants that they would violate a clearly established constitutional right when they used deadly force against Elifritz.  The Supreme Court in *Kisela* and the Ninth Circuit in *Reese* held that officers were entitled to qualified immunity for their use of deadly force even though the subjects in those cases were not attacking the officers or bystanders when the officers used deadly force.  Elifritz was running toward officers with a knife when they shot him.  Under those circumstances, the Court cannot conclude that only an officer who is "plainly incompetent or who knowingly violates the law" would have used deadly force against Elifritz or that it was beyond debate that using deadly force would violate Elifritz's Fourth Amendment rights.  *Mullenix*, 136 S. Ct. at 310 (internal quotation marks and brackets omitted); *White*, 137 S. Ct. at 551.  As a result, the officer defendants did not violate a clearly established right by using deadly force against Elifritz, and they are entitled to qualified immunity.

### III.    *Monell* Claim

To prevail on a municipal liability claim under section 1983, Plaintiff must show that a municipal custom or policy caused the violation of Elifritz's constitutional rights.  *Monell v.*

*Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978) (holding that a municipality is a "person" subject to damages liability under section 1983 when it causes a constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers"). If no constitutional violation occurred, then a municipal liability claim fails under section 1983. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (a *Monell* claim cannot survive without an underlying constitutional violation).

Thus, to establish *Monell* liability, a plaintiff must show a constitutional violation by (1) an employee acting under an expressly adopted official policy; (2) an employee acting pursuant to a longstanding practice or custom; or (3) an employee acting as a final policymaker. *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003). To establish *Monell* liability caused by a government policy or longstanding practice or custom, the plaintiff must show that (1) the plaintiff was deprived of a constitutional right; (2) the municipality had a policy, longstanding practice, or custom; (3) the policy, practice, or custom amounted to "deliberate indifference to the plaintiff's constitutional right;" and (4) the policy, practice, or custom was "the moving force behind the constitutional violation." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (internal quotations omitted).

*Monell* liability can also arise from a failure to train, supervise, or discipline that amounts to a deliberate indifference to individuals' constitutional rights. *Horton v. City of Santa Maria*, 915 F.3d 592, 602-03 (9th Cir. 2019). Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997). To show deliberate indifference, Plaintiff must demonstrate that the need "'for more or different' action 'is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of

constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Hyun Ju Park v. City and Cty. of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020) (quoting *Harris*, 489 U.S. at 390 n. 10) (brackets in original).

The threshold question in determining whether Plaintiff can establish *Monell* liability is whether a constitutional violation occurred. As explained in Part I, above, the officer defendants did not violate the Fourth Amendment when they used deadly force against Elifritz. Because no constitutional violation occurred, Plaintiff's *Monell* claim must be dismissed as a matter of law. *Heller*, 475 U.S. at 799. However, even if the officer defendants had violated Elifritz's Fourth Amendment rights, Plaintiff's *Monell* claim fails on both her longstanding practice or custom theory and her failure to train, supervise, and discipline theory of municipal liability. Plaintiff has produced insufficient evidence to create a question of fact about whether any such longstanding practice or custom exists and whether PPB was deliberately indifferent in its failure to train, supervise, and discipline officers who used excessive force. As a result, the Court grants summary judgment to the City on Plaintiff's *Monell* claim.

### A.    Longstanding Practice or Custom

Plaintiff argues that PPB has longstanding practices of (1) using excessive force against people experiencing a mental health crisis; (2) observing a police code of silence; and (3) encouraging its officers to use excessive force. To succeed on a *Monell* claim based on a longstanding custom or practice, the custom or practice "must be so 'persistent and widespread' that it constitutes a 'permanent and well settled city policy.'" *Trevino v. Gates*, 99 F.3d 911, 919 (9th Cir. 1996) (quoting *Monell*, 436 U.S. at 691).

### i.    *Using excessive force against people experiencing a mental health crisis*

Plaintiff argues that the USDOJ Report established the longstanding practice or custom of PPB officers using excessive force against individuals experiencing mental health crises and that the practice of using excessive force continued in 2018 when officers shot Elifritz. There is no evidence in the record that anyone had diagnosed or treated Elifritz for mental illness or that he experienced symptoms of a mental illness, but there is evidence that some officers believed that Elifritz was experiencing a mental health issue.[14] The Court will assume for the purpose of this Opinion only that Elifritz was experiencing a mental health crisis when the officer defendants shot him.

Viewing the evidence in the light most favorable to Plaintiff, the evidence in the record establishes only that in 2012 a custom or practice of deliberate indifference to the constitutional rights of individuals experiencing mental health crises existed within PPB. There is no evidence in the record to create a question of fact about whether the custom or practice of using excessive force against people experiencing mental health crises continued after 2012 or that any constitutional violations occurred between 2012 and 2018, when police shot Elifritz.[15] As a result, Plaintiff failed to meet her burden to establish a *Monell* claim based on a longstanding custom or practice of allowing PPB officers to use excessive force against people experiencing a mental health crisis. *See Trevino*, 99 F.3d at 918 (*Monell* liability "must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a

---

[14] Although the record establishes the presence of amphetamines and methamphetamine in Elifritz's blood, it contains no corresponding testimony to explain whether the quantities present in his blood caused his erratic behavior when police shot him.

[15] Plaintiff's complaint identifies several people who allegedly had mental illnesses and who PPB officers shot and seriously injured or killed between 2012 and 2018. Pl. Am. Compl. ¶ 3, ECF 11. There is no evidence in the record to support those allegations or to establish whether PPB's use of force against those individuals was excessive under the circumstances.

traditional method of carrying out policy."); *Bias*, 508 F.3d at 1218 (The nonmoving party must

go beyond the pleadings and designate facts showing an issue for trial.).

> ii.    *Code of silence*

Plaintiff alleges that PPB officers observe a code of silence that encourages officers to

refuse to report misconduct by other officers and to remain silent or provide false or misleading

information during investigations into police misconduct to protect themselves or other officers

from disciplinary action and civil or criminal liability.  Pl. Am. Compl. ¶ 33.  There is no

evidence in the record to support that allegation.  Even if that evidence existed, the record is also

devoid of anything that could create a question of fact about whether a code of silence was the

moving force behind the violation of Elifritz's constitutional rights.  As a result, a police code of

silence, if one existed, does not form the foundation of a *Monell* liability claim against the City

in this case.  *See Hason v. City of Los Angeles*, No. CV 11-5382-SVW (JPR), 2014 WL

12852497, at *2 (C.D. Cal. Aug. 7, 2014) (granting motion to dismiss *Monell* claim against city

based on "vague allegations of a department-wide 'code of silence'"); *Orellana v. Cty. of Los*

*Angeles*, No. CV 12-01944 MMM (CWx), 2013 WL 12122692, at *27 (C.D. Cal. Apr. 29, 2013)

(granting summary judgment on the plaintiff's *Monell* claim because there was no link between

police code of silence and officers' alleged misconduct), *aff'd*, 630 F. App'x 730 (2016);

*Arredondo v. Las Vegas Metro. Police Dep't*, No. CV-S-04-0593-RLH (LRL), 2005 WL

8161267, at *5 (D. Nev. Aug. 23, 2005) (granting summary judgment to city on the plaintiff's

*Monell* claim because the plaintiff identified only one instance of a shooting in which police

followed a code of silence), *vacated*, 280 F. App'x 633 (2008).

> iii.    *Encouraging use of excessive force*

Plaintiff alleges that PPB encourages the use of excessive force.  Pl. Am. Compl. ¶ 33.

Again, Plaintiff presents no evidence to support that allegation.  Plaintiff refers to the 2012

USDOJ Report in support of that allegation, but even if the USDOJ Report demonstrated that

PPB encouraged its officers to use excessive force, Plaintiff offers no evidence to establish a

longstanding custom or practice of encouraging the use of excessive force that continued in

2018.  As a result, Plaintiff fails to establish a basis for *Monell* liability on that theory.  *Bias*, 508

F.3d at 1218.

> iv.    *Failure to investigate of uses of force*

Plaintiff claims that PPB has a longstanding custom or practice of failing to investigate its

officers' uses of force that amounts to a policy of deliberate indifference.  PPB has a detailed

written policy for investigating every use of deadly force, and the unrefuted evidence in the

record suggests that PPB carries out that policy by thoroughly investigating each use of deadly

force by its officers.  Bell Decl. ¶¶ 2-5; Bell Decl. Ex. 15.  There is no evidence in the record

that, since 2012, PPB failed to investigate any use of deadly force by its officers or that any such

previous failure to investigate caused the officers to violate Elifritz's constitutional rights when

they shot him.  As a result, any alleged failure to investigate a use of force by PPB cannot

buttress a municipal liability claim against the City under *Monell*.

### B.    Failure to Train, Supervise, and Discipline

Plaintiff alleges that PPB has a longstanding custom or practice of failing to properly

hire, train, supervise, discipline, transfer, monitor, counsel, and control its officers who use

excessive force.  Pl. Am. Compl. ¶ 33.  Inadequate training can create section 1983 liability

"only where the failure to train amounts to deliberate indifference to the rights of persons with

whom police come into contact."  *Harris*, 489 U.S. at 388.  To establish that level of inadequacy,

Plaintiff "must demonstrate a conscious or deliberate choice" by the City to not train its officers by showing that the City "disregarded the known or obvious consequence that a particular omission in their training program would cause [City] employees to violate citizens' constitutional rights." *Flores v. Cty. of Los Angeles*, 758 F.3d 1154, 1158-59 (9th Cir. 2014) (internal quotation marks and citations omitted).

Plaintiff offered no evidence that PPB was deliberately indifferent to the need to train and supervise its officers. Plaintiff has not pointed to any category of inadequate training or explained how the training that PPB gave its officers fell so short of adequately protecting the constitutional rights of the City's residents that it amounted to deliberate indifference. PPB policy requires all new recruits to attend the state of Oregon basic police academy or an approved academy in another state, and all the officer defendants attended approved academies. PPB also requires its officers to attend an additional advanced academy, which PPB uses to train its officers on its own policies and practices, and all officers involved in the shooting of Elifritz also attended that academy. The officer defendants all received Crisis Intervention Training. Some officers also attended an optional Enhanced Crisis Intervention Training to learn additional practical skills and strategies for handling situations involving individuals in crisis. Each officer attended annual or semi-annual in-service trainings, many of which educated officers about how to handle situations involving individuals in crisis. Plaintiff has offered no evidence to support her claim that PPB's training was inadequate or that it failed to protect individuals' constitutional rights. No evidence in the record demonstrates that the City made a conscious and deliberate choice to disregard a known or obvious consequence that omissions in PPB's training program would cause its officers to violate individuals' constitutional rights. As a result, Plaintiff failed

to meet her burden to identify a question of material fact that precludes summary judgment on that theory of municipal liability.

Plaintiff can also establish liability under a failure to discipline theory by showing "repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded." *Gillette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir. 1992) (citing *McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986)). Plaintiff has produced no such evidence. There is no evidence in the record that PPB has allowed any officer to commit repeated constitutional violations without reprimand or disciplinary action. As a result, Plaintiff's failure to discipline theory also fails to support a *Monell* claim against the City.

## IV.    Wrongful Death Claim

Oregon law allows the personal representative of an estate to pursue a remedy for a decedent's death when it is "caused by the wrongful act or omission of another . . . if the decedent might have maintained an action, had the decedent lived, against the wrongdoer for an injury done by the same act or omission." O.R.S. 30.020. However, the personal representative of a decedent's estate may not bring a claim if the wrongful death occurred when the person "was engaged in conduct at the time that would constitute . . . a Class A or a Class B felony." O.R.S. 31.180(1). Felonious conduct is a complete defense that the defendant must prove by a preponderance of the evidence. O.R.S. 31.180(1), (2).

The felonious conduct defense applies to injuries that occur during a justifiable response to criminal conduct. *Harryman v. Fred Meyer, Inc.*, 289 Or. App. 324, 329 (2017), *rev. den.*, 362 Or. 665 (2018). The defense does not apply if the death resulted from deadly force that was not justifiable. O.R.S. 31.180(5). The Court finds by a preponderance of the evidence that Elifritz was engaged in felonious conduct at the time of his death. That conduct was a

substantial factor in bringing about his death, and the deadly force used by the officers in response to Elifritz's criminal conduct was justifiable. Defendants are thus entitled to a complete defense to Plaintiff's wrongful death claim.

Defendants argue that when the officer defendants used deadly force, Elifritz was engaged in conduct that constituted attempted aggravated murder and attempted assault in the first degree. Under Oregon law, an attempt to commit a crime occurs when a person "intentionally engages in conduct which constitutes a substantial step toward a commission of the crime." O.R.S. 161.405(1). Assault in the first degree occurs when a person intentionally causes serious physical injury to another with a deadly or dangerous weapon. O.R.S. 163.185(1)(a). A dangerous weapon is "any weapon, device, instrument, material or substance which under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or serious physical injury." O.R.S. 161.015(1). A serious physical injury is defined as a "physical injury which creates a substantial risk of death or which causes serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." O.R.S. 161.015(8). Attempted assault in the first degree is a Class B felony. O.R.S. 163.185(3).

Distilling the requirements of those statutes, a person commits an attempted assault in the first degree if the person intentionally engages in conduct that constitutes a substantial step toward intentionally causing serious physical injury to another with a weapon that is readily capable of causing serious physical injury or death. Elifritz's conduct met those requirements. He intentionally ran toward officers, which was an intentional substantial step toward the assault, and meets the requirements for the attempt element. He then charged officers while holding a knife, which is enough evidence for a factfinder to infer his intent to cause serious physical

injury with the knife, which establishes assault.  *State v. Spieler*, 302 Or. App. 432, 440-41 (2020) (affirming trial court's finding that accelerating a car toward officers standing in front of the car was enough to infer the defendant's intent to injure the officers, even if by doing so the defendant also intended to try to escape); *State v. Smith*, 21 Or. App. 270, 276 (1975) (quoting Commentary, Proposed Oregon Criminal Code 97 (1970)) ("'An unsuccessful attempt to cause intended physical injury is an attempted assault.'").

The Court need not determine whether Elifritz was engaged in an attempted aggravated murder at the time of his death because the Court finds by a preponderance of the evidence that, at a minimum, Elifritz was committing an attempted assault in the first degree, a Class B felony, when officers used deadly force against him.  Defendants are thus entitled to a complete defense to Plaintiff's wrongful death claim unless their conduct was unjustified.  O.R.S. 161.239 provides that "[a] peace officer may use deadly physical force only when the peace officer reasonably believes that . . . the use of deadly physical force is necessary to defend the peace officer or another person from the use or threatened imminent use of deadly physical force . . . [or] [t]he officer's life or personal safety is endangered in the particular circumstances involved." Elifritz's attempted assault met those requirements.  Thus, the officers' use of deadly physical force against Elifritz was justified under O.R.S. 161.239.

Elifritz's commission of a Class B felony at the time of his death was a substantial factor in bringing about his death.  The officers' use of deadly force was justified under Oregon law because it was necessary to prevent Elifritz's threatened imminent use of deadly physical force under circumstances that caused officers to reasonably believe that Elifritz endangered their life and personal safety.  As a result, Elifritz's felonious conduct is a complete defense to Plaintiff's wrongful death claim.

**CONCLUSION**

The Court GRANTS Defendants' Motion for Summary Judgment [29]. Plaintiff's

section 1983 claims against all Defendants are dismissed with prejudice. Plaintiff's wrongful

death claim is dismissed with prejudice. All claims against Defendants Bailey and Damerville

are dismissed with prejudice.

IT IS SO ORDERED.

DATED: _____May 13, 2020_____.


_____
MARCO A. HERNÁNDEZ
United States District Judge